Barry HARRISON, Appellant,

v.

UNITED STATES, Appellee.

No. 10–CF–153.

District of Columbia Court of Appeals.

Submitted Jan. 21, 2011.

Decided Oct. 27, 2011.

Steven R. Kiersh, Washington, DC, was on the brief for appellant.

Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Mary B. McCord, Edward A. O'Connell, and Kristi-

na L. Ament, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and PRYOR, Senior Judge.[*]

GLICKMAN, Associate Judge:

After a jury trial, Barry Harrison was convicted of one count of enticing a child, with aggravating circumstances;[1] three counts of second-degree child sexual abuse with aggravating circumstances;[2] and one count of misdemeanor sexual abuse of a child, with aggravating circumstances,[3] for sexually assaulting T.G., a female student in the tenth grade at Spingarn Senior High School in Northeast Washington. Harrison argues that his conviction should be reversed because the trial court abused its discretion in admitting testimony by three other female students at the high school that Harrison had made sexually suggestive comments to them prior to his alleged sexual assault on T.G. The government responds that the testimony was properly admitted to establish a motive for Harrison's interest in T.G. We reject that rationale and conclude that Harrison is entitled to a new trial. His inappropriate remarks to other students were relevant only as propensity evidence from which the jury could infer, improperly, that he acted toward T.G. in conformity with the bad character revealed by those remarks.[4]

## I. Procedural and Factual Background

### A. Pretrial Ruling

Before trial, the government filed a notice of intent to introduce evidence that Harrison had made sexually suggestive comments to four high school students other than the complaining witness T.G.[5] The court considered the matter at a pretrial hearing. The government offered several rationales under which the comments would be admissible, including as proof of Harrison's "unusual sexual preference" for teenage girls; as evidence of the circumstances surrounding the assault on T.G.; and as evidence of his motive and intent to engage in sexual conduct with T.G. Harrison opposed the introduction of the evidence, arguing, *inter alia*, that it was being offered "to show predisposition." In response to Harrison's argument that the disputed evidence was prejudicial and lacked legitimate probative value, the court observed that its value for the government was in showing that Harrison "had an interest in, to use the vernacular, hitting on these young girls." Thereafter, the court held the evidence "clearly admissible on the issue of intent, motive, [and] absence of mistake or accident," and also to prove "peculiar sexual preference."

### B. The Government's Opening Statement

In his opening statement, the prosecutor told the jury that this case involved "a

---

[*] Judge Kramer was assigned to this case at the time of submission. Following her retirement on May 1, 2011, Judge Pryor was assigned to replace her on the division.

1. D.C.Code §§ 22–3010, –3020(a)(2) (2011 Supp.).

2. *Id.* §§ 22–3009, –3020(a)(2) (2001 & 2011 Supp.).

3. *Id.* §§ 22–3010.01, –3020(a)(2) (2011 Supp.).

4. As discussed below, the theory that Harrison's sexually suggestive comments to other female students explained his sexual interest in T.G. by showing he had an unusual sexual preference was not presented to the jury, and on appeal the government has declined to rely on that theory to support admission of the evidence.

5. At trial, only three of the other students testified. As a result, Harrison's alleged remarks to the fourth student were not introduced in evidence.

crime of opportunity." According to the prosecutor, the evidence would show that once Harrison was introduced to T.G. and her social circle, he proceeded to "hit on" them; and the jurors would hear from these "other Spingarn students about their interactions with Barry Harrison prior to April the 14th," the day of the assault. "From all of that testimony," the prosecutor explained,

> you will understand that Barry Harrison had a motive here. That he was attracted to teenage girls. That he made statements to a number of girls. That he made phone calls to a number of girls. And then on April the 14th, T[.G.] was just at the wrong place at the wrong time when she ran across Barry Harrison.

## C. The Government's Evidence at Trial

In the spring of 2009, Harrison was an intern for Peaceoholics, a non-profit organization that trains mentors to work with at-risk youths, and for a period of approximately three weeks he was placed at Spingarn Senior High School. In that capacity, Harrison was present during mediation sessions held at the school in late March or April to resolve a conflict involving three female students: T.G., J.M., and T.D. Apparently, a romantic relationship between T.G. and J.M. had fallen apart when J.M. became interested in T.D., and this had led to fighting between T.G. and J.M. School administrators were concerned about the conflict and arranged to have Peaceoholics facilitate mediation.

The mediation was successful in resolving the students' quarrel. Afterward, Harrison approached each of the girls involved and talked about starting a sexual relationship. T.D., who was in the tenth grade at the time, testified that Harrison knew her schedule and would seek her out during school hours and would call her frequently on her home telephone number. When Harrison asked for her cell phone number, she declined to give it, telling him (falsely) that she did not have a cell phone. On one occasion, T.D. testified, Harrison told her she was "too pretty to be gay," and that she "need[ed] a man in [her] life." He spoke to her about "being in a relationship," said "he missed [her] fine ass," and asked T.D. "for a kiss." T.D. found these remarks offensive, but did not think most of his calls were inappropriate. "He was actually a cool man," T.D. stated. She did not take Harrison too seriously and never reported his conduct.

J.M. testified that Harrison often met her in school, where she was in the eleventh grade, and called her to check in and see how she was doing. She gave Harrison both her cell phone and home telephone numbers. Like T.D., J.M. found some of Harrison's comments improper. When they were standing just outside a classroom, for example, Harrison remarked that she "had some very attractive breasts." About three or four days later, he told her in a school hallway that he "went home drunk and thought about [her] all night." Harrison previously said he was "fond" of her sexuality.

T.G., the complainant in this case, testified that Harrison presented himself to her as a mentoring figure, someone she could speak with if other problems arose with students or school. He asked for her telephone number and she gave it to him. Yet T.G. also recalled instances of inappropriate or borderline conduct. One time, after a basketball game in which she had played, Harrison patted her shoulder in a way that felt more like a "rub" down her back or arm. Harrison later pulled T.G. aside in the school auditorium and said he wanted "a relationship," meaning "I scratch your back if you scratch mines [sic]." T.G.

grew more uncomfortable after Harrison called her "[s]weetie" during one conversation and in school looked at her "kind of strangely in a way that a grown man shouldn't look at a child." After frequent calls from Harrison, T.G. put his telephone number on her block list.

In addition to the three girls Harrison approached following the mediation, he made overtures to A.G., a female student in the 11th grade who was friends with T.G., J.M., and T.D. Once, A.G. testified, Harrison told her "he wanted [her] to be his girlfriend" and asked for her telephone number, but she refused to give it to him and walked away. A.G. later encountered Harrison on the third floor of the school. After talking briefly, Harrison suggested that they "get off camer[a]," because he did not like cameras. A.G. rejected his proposition. "I wasn't sure what he was going to do so I just said no," A.G. testified, explaining that she was "afraid" and wanted to know why he was so intent upon going somewhere out of view of the surveillance cameras.

On Easter Sunday, April 12, 2009, Harrison placed a number of phone calls to T.D., J.M., and T.G., according to phone records introduced by the government. Two days later, in the afternoon on April 14, T.G. saw Harrison on the second floor of the Spingarn building as she was heading to class. He asked to speak with her and together they walked past her classroom and down a stairwell to the first floor. Harrison invited T.G. to attend an upcoming Peaceoholics event in Southeast Washington, along with her cousin and J.M. They proceeded down another stairwell to the basement, passing a security officer on his way up to the first floor. Once they were alone in the basement, T.G. testified, Harrison declared he was "going to stop beating around the bush." Harrison told T.G. she was beautiful, that

he was attracted to her, that he got aroused when he saw her, and that he wanted "a man and a woman" relationship with her. T.G. was too scared to respond. According to T.G., Harrison then grabbed her buttocks and pulled her toward him, close enough to feel his erect penis. He kissed her, forcing his tongue into her mouth. Harrison next took T.G.'s left hand and forced her to touch his erect penis. "Don't mention what happened," Harrison warned, "don't say nothing to no one."

T.G. ran back up to the second floor and knocked on the door where J.M. was in class. When J.M. saw T.G.'s worried face, she left the classroom. T.G. began crying and they entered a nearby bathroom where T.G. informed J.M. that Harrison had assaulted her. J.M. suggested they alert a school administrator or the police, but T.G. refused to do so, telling J.M. that she was scared. They then went up to the third floor to find T.G.'s half-sister, after which T.G. ran out the front door of the school with J.M. behind her. A security officer caught up with them, and both J.M. and T.G. recounted what had happened.

### D. The Defense Case

The defense theory was that T.G. and her friends fabricated their stories of Harrison's inappropriate advances and his assault on T.G. so that he would be removed from the school. According to the defense, they did not want Harrison interfering with their freedom to roam the halls and cut class, or meddling with their personal relationships. One defense witness testified that he overheard T.G. tell a group of students, "I did this on purpose because he was in the way of me and my girl being in the hallway." A school official, Charles Alston, testified that T.G., J.M., and T.D. often skipped class and walked the corridors. Another former Spingarn student

recalled T.G. complaining that her girl-friend was "letting the old man to interfere with their relationship," and that once when they saw Harrison escorting T.G.'s girlfriend to class, T.G. remarked, "I don't like him, I'm gonna get him out this building."

Harrison testified on his own behalf. He admitted contacting the girls frequently, but said he did so to check on their well-being and denied making sexually suggestive remarks or soliciting sexual relationships. On April 14, Harrison testified, he encountered T.G. and some other students engaged in an argument on the second floor. To prevent a fight, he intervened and offered to walk T.G. to her class, which she said was in the basement. When they arrived there, however, T.G. said she did not feel well and refused to go to class. Harrison talked with her about coming to a Peaceoholics event with other students. Eventually, he said, they walked back up the stairwell and went their separate ways. Harrison later saw T.G. on the third floor having a conversation with some girls outside a bathroom. She did not appear to be upset, he testified.

### E. The Government's Closing and Rebuttal Arguments

The prosecutor began his closing argument by stating that the case was about three things: credibility, motive, and opportunity. As he spoke to each of those elements in turn, he repeatedly emphasized Harrison's "untoward" contacts with T.G.'s fellow students. First, attacking Harrison's credibility, he urged the jury to look at the phone records of Harrison's telephone calls to J.M., T.D., and T.G. on Easter Sunday, and asked, "What was the defendant doing calling these girls constantly?" The prosecutor left that question unanswered as he proceeded to defend the credibility of the government's student witnesses and turned to the question of motive. Recounting Harrison's sexually suggestive comments, the prosecutor argued as follows:

> And the defendant made all these statements to these three individuals, telling [J.M.] that she has beautiful breasts. He was up all night thinking about her.
>
> Telling [T.D.] that she shouldn't be gay, that she needs a man. Telling [T.D.] that he wanted her to be his girlfriend.
>
> Asking [A.G.] that—to be his girlfriend. Telling [A.G.], "I want to talk to you, but not on campus."
>
> That's significant, ladies and gentlemen. What is that right there? That's motive.

The prosecutor did not explain what he meant by linking Harrison's sexually suggestive statements to motive; he did not specify the motive those statements evinced. But he revisited the subject when he addressed Harrison's opportunity to commit the charged offenses. Spingarn High School was an "opportunity-rich environment for someone with motive like Barry Harrison," the prosecutor argued, because he was unsupervised and able to walk all around the building, "pull kids out of class, grab a kid who is walking the halls, take them down a stairwell where there's no video camera, and do what he can." And as proof that Harrison "sought out the opportunity to commit this crime," the prosecutor cited the "crucial testimony" of A.G.:

> The defendant had the opportunity to commit this crime. The defendant sought out the opportunity to commit this crime.
>
> How do you know that? The crucial testimony in this case, ladies and gentle-

men, with regard to opportunity is [A.G.]

What did she tell you? That the—after talking to the defendant twice, first time in the auditorium, second time when he asked her to be his girlfriend and asked her for her phone number.

The third time, he said, "I want to talk to you." She was like, "Okay, let's talk." What did Barry Harrison tell her, "No, not here. I don't like talking on campus."

This was a crime of opportunity, ladies and gentlemen. Barry Harrison sought out the opportunity. This crime could have happened to any one of these girls. Could have happened to any girl. "[T.G.]," the prosecutor concluded, "was just the unlucky one who was, perhaps, a little bit too trusting or just, perhaps, not wary enough, who went down to the bottom of that stairwell where the defendant could assault her and not be caught on video camera."[6]

Responding to the prosecutor's argument, defense counsel reminded the jury that Harrison was "not on trial" for his comments to students other than T.G.[7] In rebuttal, the prosecutor told the jury that those comments were "proof" of Harrison's "motive to commit this offense":

[T]he defendant is not on trial for these other statements that he made to [T.G.] and [J.M.] and [T.D.] and [A.G.]

He's not on trial for hitting on them, essentially.

But those statements are evidence of his motive to commit this offense and you can take those statements as proof

that he had the motive to commit this offense.

## F. Jury Instruction

The trial court instructed the jury without objection that Harrison's sexually suggestive statements to three other female students were admitted not as evidence of his "bad character" or "criminal personality," but as proof of motive—specifically, that he "was motivated to engage the complainant [T.G.] in a sexual relationship":

The Court admitted evidence in this case that the defendant made sexually suggestive statements not only to the complaining witness but also to three other female students who were witnesses in this trial.

Evidence of these alleged statements were [sic] admitted into evidence for you to consider whether if you believe that Barry Harrison, in fact, did make such statements to those witnesses, whether it shows that he was motivated to engage the complainant—I'm using the initials T.G.—in a sexual relationship.

That is, you may consider evidence of those statements in determining whether the government has proved beyond a reasonable doubt any of the charges in the indictment.

Now, you may not consider that evidence for any other purpose with the exception of the statements that the defendant allegedly made to the complainant on April 14, 2009, the day of the alleged offense.

---

**6.** The government's brief on appeal glosses over the foregoing argumentation, asserting that "[t]he prosecutor did not discuss appellant's statements to the [sic] T.G. and her friends until rebuttal closing." Brief for Appellee at 15. That assertion is obviously erroneous.

**7.** Defense counsel otherwise did not discuss Harrison's alleged remarks to the other students, except to argue that their testimony was uncorroborated.

The defendant has not been charged with any offense relating to the other statements made to the complainant at some other time or the other witnesses.

And so you may not consider this evidence to conclude that the defendant has a bad character or that the defendant has a criminal personality.

The law does not allow you to convict a person simply because you believe that he may have said or done bad things not specifically charged as crimes in this case.

The defendant is on trial for the crimes charged and you may use the evidence of acts or statements not charged only for the limited purpose of helping you decide whether the defendant is, in fact, the person who committed the offenses charged in the indictment.

## II. Discussion

Harrison contends that the trial court erred in permitting the government to introduce the evidence of his sexually suggestive comments to female students other than the complaining witness. He argues that the comments amounted to prior bad acts and were used at trial for the impermissible purpose of showing his predisposition or propensity to commit the crimes with which he was charged.[8] The government argues that the evidence was admissible to show Harrison had a motive to commit the charged sexual offenses against T.G. (making it more likely that he did commit those offenses). More broadly, the trial court instructed the jury that the purpose of the evidence was to show that Harrison had a motive to engage T.G. in a sexual relationship. We review the trial court's decision to admit the evidence for abuse of discretion.[9]

## A. The Prohibition on Prior Bad Acts Evidence to Prove Propensity

The principles of law that govern this appeal are well settled. It is fundamental that evidence of prior bad acts independent of the crimes charged is inadmissible to show the defendant's disposition or propensity to commit the charged offenses, from which the jury improperly could infer the defendant actually did commit them.[10] Leading jurors to draw such an improper propensity inference is presumptively prejudicial.[11] Evidence of prior bad acts may be admissible, though, if offered for a "substantial, legitimate purpose," rather than to show the defendant's

---

8. Harrison argues, in particular, that the evidence did not fall within the "unusual sexual preference" exception to the general rule against propensity evidence. *See Koonce v. United States*, 993 A.2d 544, 553–57 (D.C. 2010); *Howard v. United States*, 663 A.2d 524, 527–29 (D.C.1995). We need not address the applicability of this exception, however, because the government does not rely on it to defend the trial court's ruling. As the government points out, although the court stated at the pretrial conference that Harrison's sexually suggestive remarks to other students would be admissible to prove his "peculiar" sexual preference, that was not how the remarks were treated at trial. Rather, both the court and the prosecutor treated the evidence as relevant solely to prove Harrison's motive for committing the charged offenses. The "unusual sexual preference" theory was never mentioned at trial (and the court specifically instructed the jury *not* to consider Harrison's remarks as proof of bad character or criminal personality).

9. *Goines v. United States*, 905 A.2d 795, 799 (D.C.2006) (citation omitted).

10. *See (William A.) Johnson v. United States*, 683 A.2d 1087, 1092 (D.C.1996) (en banc); *Wright v. United States*, 570 A.2d 731, 733 (D.C.1990).

11. *Drew v. United States*, 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964).

propensity.[12] One such legitimate purpose—the one on which the government relies in this appeal—is to establish that the defendant had a motive to commit the charged offense.[13] In principle, "[w]hen the accused denies committing the crime, ... the prosecutor is permitted, as part of his effort to prove that the ... accused did commit the act, to prove that the accused had a motive for perpetrating the crime against the victim."[14] The prosecutor has the burden of demonstrating that the evidence is being introduced for a substantial and legitimate purpose.[15] Assuming the proffer passes muster, and there is clear and convincing evidence that the prior bad acts occurred, the trial court "must additionally consider the relative probative value of the evidence and the danger of unfair prejudice that it poses."[16] The trial court should exclude the evidence if the danger of unfair prejudice substantially outweighs its probative value.[17]

▮▮▮ The government suggests, in passing, that Harrison's comments to T.D., J.M., and A.G. were "not technically 'other-crimes' evidence" because they "did not rise to the level of crimes."[18] Perhaps so, but the government is wise not to press the point. The basic rule, which we have recognized as "consistent with District of Columbia law,"[19] is embodied in the first sentence of Federal Rule of Evidence 404(b): "Evidence of other crimes, wrongs, *or acts* is not admissible to prove the character of a person in order to show action in conformity therewith" (emphasis added). Harrison's sexually suggestive remarks to students other than the complainant were far from innocuous; as the trial court observed, they portrayed him as an unsavory character who took advantage of a position of trust to "hit on" teenage girls.[20] The bar against propensity evidence therefore must apply here, for the law generally "disfavors the admission of evidence of a person's character in order to prove con-

---

**12.** *Id.* at 16, 331 F.2d at 90.

**13.** *Johnson,* 683 A.2d at 1092 (citing *Drew* 118 U.S.App.D.C. at 16, 331 F.2d at 90).

**14.** *Frye v. United States,* 926 A.2d 1085, 1093–94 (D.C.2005) (internal quotation marks and brackets omitted). Usually, "[t]he key to admissibility under the motive exception ... is the fact that the defendant's prior ... conduct was directed toward the same victim." *Id.* at 1093 (quoting *Hill v. United States,* 600 A.2d 58, 62 (D.C.1991)). *See, e.g., Bacchus v. United States,* 970 A.2d 269, 275–76 (D.C.2009) (evidence of prior instances of domestic violence held admissible to show appellant's motive for subsequent assault) (citing cases). Here, of course, Harrison's prior conduct toward J.M., T.D., and A.G. was not directed toward T.G., the alleged victim of his charged offenses.

**15.** *Johnson,* 683 A.2d at 1101 (citing *Thompson v. United States,* 546 A.2d 414, 424 n. 18 (D.C.1988)).

**16.** *Id.* at 1092.

**17.** *Id.* at 1101.

**18.** Brief for Appellee at 21. We have stated that the general prohibition on the admission of prior bad acts evidence applies to acts that are criminal or are at least " 'minimally in the nature of a criminal offense.' " *Bigelow v. United States,* 498 A.2d 210, 212 (D.C.1985) (quoting *Wheeler v. United States,* 470 A.2d 761, 769 (D.C.1983)); *see also Catlett v. United States,* 545 A.2d 1202, 1218 (D.C.1988).

**19.** *Johnson,* 683 A.2d at 1100 n. 17; *accord, Jackson v. United States,* 856 A.2d 1111, 1116 (D.C.2004).

**20.** At least arguably, Harrison's communications (particularly his comments to T.D.) verged on the offense of enticement. *See* D.C.Code § 22–3010(a)(2) ("Whoever, ... being in a significant relationship with a minor, ... attempts to seduce, entice, allure, convince or persuade a ... minor to engage in a sexual act or contact shall be imprisoned for not more than 5 years or may be fined in an amount not to exceed $50,000, or both.").

duct in conformity with that character." [21] Thus, the government correctly agrees that it must demonstrate that Harrison's remarks to the other girls were admitted for a "substantial, legitimate" purpose other than showing his disposition or propensity to commit the charged offenses.

### B. Admission of Harrison's Remarks as Proof of Motive

It can be easy to confuse evidence of propensity with evidence of motive, and "courts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury." [22] When, as here, the accused denies having committed the charged offense, his motive to commit it may be shown, but not via evidence that is merely evidence of propensity. Accordingly, we must determine what "motive" meant in this case and whether the probative value of Harrison's statements to T.D., J.M., and A.G. depended "wholly or primarily" on the jury inferring that he was predisposed or had a propensity to commit the charged crimes against T.G. [23]

A motive is simply "an emotion or state of mind that prompts a person to act in a particular way; an incentive for certain volitional activity." [24] In determining whether particular prior bad acts evidence is admissible to prove motive, the specificity of the motive is of critical importance, because "[t]he more common or generalized the motive evidence, the more it verges upon inadmissibility as mere propensity evidence." [25] If, for instance, in a sexual assault prosecution, evidence of prior bad acts against other victims is introduced to show the defendant's desire to engage in heterosexual sex, the motive is indistinguishable from predisposition—for such evidence to be relevant, the jurors must infer the defendant's general sexual desire from the prior bad acts, and then infer that he acted in conformity with that desire and committed the charged sexual offense. As a rule, "it is improper to offer prior instances of the same offense [against persons other than the victim in the instant case] to show motive, since such acts are relevant only by relying on the improper inference that the defendant has a propensity to engage in that conduct." [26]

---

**21.** *McLean v. United States*, 377 A.2d 74, 77 (D.C.1977) (citations omitted).

**22.** 22 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5240 at 480 (1978) [hereinafter "WRIGHT & GRAHAM"]; *see also* 3 CLIFFORD FISHMAN, JONES ON EVIDENCE: CIVIL AND CRIMINAL § 17:51 at 457 (7th ed.1998) [hereinafter "JONES ON EVIDENCE"] ("[W]hile evidence of motive may be important for a variety of reasons, a court should take care that 'motive' does not become a back door to admit highly prejudicial evidence of little legitimate probative value.").

**23.** *Johnson*, 683 A.2d at 1093 (quoting *Thompson*, 546 A.2d at 419–20).

**24.** WRIGHT & GRAHAM, § 5240 at 479.

**25.** *Robinson v. United States*, 623 A.2d 1234, 1239 (D.C.1993); *see also*, 1 McCORMICK ON

EVIDENCE § 190 at 761 (6th ed.2006) (noting that when the supposed " 'motive' is so common that the reasoning that establishes relevance verges on ordinary propensity reasoning," the evidence should be excluded).

**26.** 2 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 404.22[3] at 404–120 (Joseph M. McLaughlin ed., 2d ed.2011). Thus, "[u]nder the traditional approach to extrinsic act evidence, that a defendant committed other assaults to obtain sexual gratification does not, by itself, justify admission of such evidence at a trial for yet another sexual assault, although a number of jurisdictions have created special rules admitting such evidence in sexual assault cases." JONES ON EVIDENCE § 17:54 at 466. As previously noted, this jurisdiction recognizes an exception to the rule against propensity evidence for proof in certain cases of a defendant's unusual sexual preference, but

In this case, the only specific "motive" the government ever articulated during trial suffered from exactly this defect. According to the prosecutor's opening statement, the motive revealed by Harrison's remarks to T.D., J.M., and A.G. was that he "was attracted to teenage girls." The opening statement was the only time during the trial that the prosecutor attempted to specify the motive revealed by Harrison's comments to the three students. In closing argument, the prosecutor reiterated that those comments were evidence of Harrison's motive to commit the charged offenses against T.G., but the prosecutor never gave a name to that motive. For its part, while the trial court instructed the jury that it could consider whether Harrison's statements showed he was motivated to engage T.G. in a sexual relationship, the instructions did not furnish sufficient guidance as to how the jury properly might draw that inference. Such guidance was not supplied by the mere admonition against using the statements "to conclude that the defendant has a bad character or that the defendant has a criminal personality."[27] This was not enough to ensure that the jury did not rely on Harrison's comments to the students other than T.G. to find that his attraction to teenage girls meant he had a motive to commit the offenses against her.

It is hard to see how else the jury could have utilized the evidence. In its brief on appeal, the government argues that Harrison's comments revealed a motive that was narrower than an attraction to teenage girls in general. According to the government, his motive was his attraction to the girls in "T.G.'s group" in particular.[28] Emphasizing that Harrison started hitting on T.G., J.M., and T.D. after becoming privy to their "love triangle" in the Peaceoholics mediation, the government asserts that Harrison's sexually suggestive comments to the three girls "demonstrated the motive to involve himself voyeuristically in their relationships and attempt to change their sexuality."[29] The government admits that A.G. was not a member of the love triangle, but, it says, "she was friendly with those who were."[30]

Based on the record, this strikes us as a somewhat strained theory of motivation, at least to the extent that it posits Harrison was motivated by a desire to "change the sexuality" of the girls he approached. (A.G.'s sexuality was not in evidence, it should be noted.) And whatever we may think of this appellate theory, it was not what the government suggested at trial. Contrary to the argument crafted on appeal that Harrison's motive was focused narrowly on his attraction to "T.G.'s group" (whatever that means), the prosecutor argued to the jury that T.G. was just "unlucky"; that her sexual abuse by Harrison was "a crime of opportunity" that "[c]ould have happened to any girl" at Spingarn because Harrison was on the prowl ("sought out the opportunity," as shown especially by his sexual remarks to A.G.); in short, that Harrison's interac-

---

the applicability of that exception in this case is not before us.

27. Because we conclude that Harrison's comments to students other than T.G. were inadmissible for the purpose of proving his motive to assault T.G., his failure to request more specific jury instructions on the proper use of the evidence for that purpose is not an obstacle to his appeal. To preserve his claim for appeal, it suffices that Harrison had objected to the introduction of the evidence on the ground that it served only to prove propensity, and the court had overruled that objection.

28. Brief for Appellee at 24.

29. *Id.* at 23, 24.

30. *Id.* at 24.

tions with the other female students showed his "motive" to be that he simply was "attracted to teenage girls" in general—not just to T.G. and her "group."

The line between proper motive evidence and improper propensity evidence therefore was crossed in this case: The jury was invited to infer from Harrison's remarks to T.D., J.M., and A.G. that he had a sexual interest in teenage girls, and (the forbidden inference) that he acted in conformity with that bad character trait by committing the charged offenses against T.G. We do not perceive how else the jury could have used the evidence.

### III. Conclusion

Accordingly, we hold that the trial court abused its discretion in allowing the prosecution to introduce the evidence of Harrison's sexually suggestive comments to students other than the complainant, and by instructing the jury that it could consider those comments as proof that Harrison was motivated to engage the complainant in a sexual relationship. The court's instruction not to consider this evidence to conclude that Harrison had a bad character or a criminal personality was not curative. We cannot find the error to have been harmless (nor does the government so contend). We therefore reverse Harrison's convictions and remand for a new trial.

*So ordered.*