*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 05-CO-1261 & 05-CO-1262

WALLACE G. MITCHELL, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(FEL-3556-90)

(Hon. James E. Boasberg, Motions Judge)

(Argued November 1, 2012                          Decided December 12, 2013)

*Steven R. Kiersh* for appellant.

*Angela G. Schmidt*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Roy W. McLeese III*, Assistant United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Mary B. McCord*, and *Kacie M. Weston*, Assistant United States Attorneys, were on the briefs, for appellee.

Before OBERLY, BECKWITH, and EASTERLY, *Associate Judges*.

BECKWITH, *Associate Judge*: Appellant Wallace Mitchell, serving a life sentence for murder and other crimes, appeals the Superior Court's denial of his second post-conviction motion. Among other claims, Mr. Mitchell requested that "blood evidence" left at the scene be tested for DNA, which then-Superior Court Judge James E. Boasberg construed as an application under the Innocence

Protection Act (IPA), D.C. Code §§ 22-4131 to -4135 (2012 Repl.)[1]—specifically, § 22-4133, which governs post-conviction DNA testing. Mr. Mitchell claimed that DNA testing would implicate his codefendant Floyd Calloway or someone else as the assailant and thus help establish his innocence, and he appeals the court's rejection of his application for testing. The government—quoting police testimony from the trial and attaching the police evidence report, both purporting to show that no testable material exists—asserts that Mr. Mitchell's application "fails at its inception . . . because the record does not indicate that any DNA evidence was collected from the crime scene." We ordered supplemental briefing on this issue, and now hold that if the government responds to an application for post-conviction DNA testing by claiming not to possess biological material, it bears the burden of substantiating that claim, and the unsworn claim it has offered in this case does not satisfy that burden.

As to whether the trial court erred in ultimately rejecting Mr. Mitchell's request for DNA testing, we conclude that the court properly construed the request as an application under the IPA, but required too much of Mr. Mitchell under the threshold requirements of § 22-4133 (b) and also erred in not applying the

---

[1] All subsequent statutory references are also to D.C. Code (2012 Repl.).

"reasonable probability" evidentiary standard of § 22-4133 (d). We therefore reverse the court's ruling denying Mr. Mitchell's application for DNA testing and remand that issue for consideration under the proper standard. We affirm the court's determination that all of Mr. Mitchell's remaining claims lack merit.

## I.    Background

In 1991, a jury convicted Mr. Mitchell of armed premeditated murder, armed felony murder, armed first-degree burglary, armed assault with intent to kill, and possession of a firearm during a crime of violence. *Mitchell v. United States*, 629 A.2d 10, 11 (D.C. 1993). In the direct appeal from those convictions, we described the facts as follows:

> The government's evidence at trial revealed that on January 16, 1990, appellant, in the company of Mr. Floyd Calloway and Ms. [Rebecca] Halicki, drove from his residence in Youngstown, Ohio to the District of Columbia to "get [appellant's] wife [Ms. Denise Mitchell] in Washington, D.C." Suspecting that his wife had taken up residence with Messrs. Nelson and Arrington who "won't let her go," appellant was overheard stating: "I don't mind shooting somebody if I have to." . . . At approximately 3:00 a.m., after some initial difficulty in finding the apartment building— which provoked appellant to "want to hurt someone that much more"—Ms. Halicki located the building where Nelson and Arrington

resided. . . . Upon entering the building, the trio proceeded to Nelson's door, whereupon appellant and Mr. Calloway positioned themselves on either side while Ms. Halicki proceeded to knock on the door. Mr. Arrington responded to the knock and, with the door closed, explained to Ms. Halicki that he did not know where to find Ms. Mitchell. After a brief conversation, Mr. Arrington opened the door and peeped out. At that moment, Halicki jumped to the side and Arrington, sensing trouble, slammed the door shut. Appellant fired two shotgun blasts through the door, striking Mr. Arrington in the arm and back. Mr. Arrington ran toward Mr. Nelson's room and informed Mr. Nelson that he had been shot and that the shooter was coming through the front door. While Nelson leapt from his bed and closed the bedroom door, Arrington hid in the closet. Appellant then fired a shotgun blast through the bedroom door hitting Nelson, entered the room, and began interrogating Nelson about Denise Mitchell's whereabouts. Although Nelson insisted that he did not know and pleaded for his life, appellant reloaded one of the guns and fired three more times. Mr. Nelson died from his wounds.

*Id.* at 11-12.

This second post-conviction motion under § 23-110 follows three habeas petitions in federal court—all pro se, none successful. Among other claims, Mr. Mitchell requested that "blood evidence" be tested for DNA. Acting pro se and "ignorant of the actual requirements of the IPA," as he later explained, Mr. Mitchell framed his request for DNA testing as a § 23-110 motion for post-

conviction relief, instead of as a § 22-4133 motion for post-conviction DNA testing, and did not deliberately set out to meet the initial requirements of the IPA or the four specific requirements of § 22-4133 (b). That is, under § 22-4133 (a), the biological material must "be identified as evidence in the case," be in the government's possession or have been carefully maintained, and not have been "previously subject to DNA testing" for any of four enumerated reasons. And under § 22-4133 (b):

> (b) The application shall:
>
> (1) Include an affidavit by the applicant, under penalty of perjury, stating that the applicant is actually innocent of the crime that is the subject of the application; . . .
>
> (2) Identify the specific evidence for which DNA testing is requested;
>
> (3) Set forth the reason that the requested DNA testing was not previously obtained; and
>
> (4) Explain how the DNA evidence would help establish that the applicant is actually innocent despite having been convicted at trial or having pled guilty.

The court ordered the government to respond to Mr. Mitchell's motion.[2] Among other arguments, the government pointed out alleged deficiencies in Mr. Mitchell's application for DNA testing and urged the court to deny it as improperly pled. Mr. Mitchell then undertook to respond to the government, again asking for counsel in order to "eliminate any deficiencies in these pleadings due to ignorance of the law." Now aware of the § 22-4133 pleading requirements, he argued that he had fortuitously pled them "by chance," except for the affidavit claiming innocence, which he then included.[3]

The court determined that Mr. Mitchell had "failed to meet the requirements of § 22-4133," explaining that Mr. Mitchell had "not submitted the proper affidavit stating that he is actually innocent of this crime" or "identified the specific evidence he seeks to have tested." The court's "particular concern," however, was Mr. Mitchell's "failure, in his detailed explanation of the need for DNA testing, to

---

[2] The court took its cue from § 22-4133 (c): "Unless the application and files and records of the case conclusively show that the applicant is entitled to no relief, the court shall notify the prosecution of an application made pursuant to subsection (a) of this section and shall afford the prosecution an opportunity to respond."

[3] The government filed its opposition on June 15, 2005, and Mr. Mitchell replied two weeks later, in a filing dated June 30, 2005. The court evidently had not received Mr. Mitchell's reply before issuing its order on July 15, 2005.

adequately explain how such testing would help establish his actual innocence." In the court's view, the IPA—specifically § 22-4135 (c)(2)—"requires specific, non-conclusory facts that demonstrate that the movant is actually innocent despite having been convicted at trial," and there was "no explanation as to how the absence of Defendant's DNA at the scene or the presence of another party's DNA could provide specific evidence of actual innocence."

Mr. Mitchell asked for reconsideration and again explained how DNA testing would establish his innocence. The court again denied his request for DNA testing, stating that "Defendant reasserts arguments the Court has previously found unconvincing."[4] Mr. Mitchell appeals.

## II.    Analysis

### A. The Alleged Absence of Testable Biological Material

We first address the government's suggestion on appeal that a court may deny a prisoner's application for post-conviction DNA testing of biological material based on the government's pronouncement that the sought-after material does not exist. The government contends, that is, that Mr. Mitchell's claim "fails

---

[4] The court had by then received Mr. Mitchell's previous filings.

at its inception . . . because the record does not indicate that any DNA evidence was collected from the crime scene." In support, the government cites the 1991 trial testimony of the police officer who collected evidence at the crime scene. That officer testified that he recovered latent fingerprints as well as shotgun wadding, casings, and pellets. He also took photographs, which depicted blood, but as the government states, he "did not testify that he recovered any blood or hair from the crime scene." Attaching the 1990 Crime Scene Evidence Report, which also does not record any biological material, the government concludes that Mr. Mitchell's application for DNA testing must fail "[b]ecause there simply is no DNA evidence from the crime scene to test."

The IPA, which enables D.C. prisoners to apply for DNA testing of biological material "at any time," D.C. Code § 22-4133, and which also allows petitioners to "move the court to vacate the conviction or to grant a new trial on grounds of actual innocence based on new evidence," § 22-4135, was designed "to eliminate the absence of a judicial remedy for persons who obtain new evidence that affirmatively shows their innocence more than three years after conviction or plea of guilty," *Bouknight v. United States*, 867 A.2d 245, 251 (D.C. 2005). Under section (d) of § 22-4133, the court "shall order DNA testing" if it determines that

the application satisfies the requirements of § 22-4133 (a) and (b) and if it determines that "there is a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent of the crime for which the applicant was convicted or adjudicated as delinquent."

The IPA does not explain, and we have not addressed, how a court should proceed when the government opposes an applicant's request for DNA testing on grounds that the sought-after biological material does not exist or no longer exists. Mr. Mitchell claimed, without providing support, that "blood samples were retained." The trial court did not determine—and was not asked to determine—whether any such material existed. We ordered supplemental briefing and asked the parties to address, among other things, "who shall have the burden of proving that testable material exists."

Both the statute's text and its purpose lead us to conclude that if the government responds to an application under the IPA for DNA testing by alleging that it possesses no testable biological material, it bears the burden of substantiating that claim. The statute implicitly places the burden on the government, as § 22-4134 (a) requires law enforcement agencies to "preserve

biological material that was seized or recovered as evidence . . . for 5 years or as long as any person incarcerated in connection with that case or investigation remains in custody, whichever is longer."[5]  Section 22-4133 (c) also directs that "[u]pon receiving notice of an application [for DNA testing], the prosecution shall take the necessary steps to ensure that any remaining biological material that was obtained in connection with the case or investigation is preserved pending the completion of proceedings under this section."  In addition, placing the burden on a non-custodian—the applicant—may thwart the purpose of the statute by rendering relief under the IPA almost impossible.  *See Jeffrey v. United States*, 892 A.2d 1122, 1128 (D.C. 2006) ("We must also be mindful that our interpretation is not at variance with the policy of the legislation as a whole.").

Other states with statutes allowing post-conviction DNA testing based on claims of actual innocence have similarly determined that the government's obligation to preserve sought-after biological material carries a concomitant obligation to produce it or explain why it cannot be produced.  The Maryland

---

[5]  The IPA allows that "[n]otwithstanding subsection (a)," the District of Columbia may dispose of biological material after 5 years if it first provides an opportunity for interested persons to apply for DNA testing.  D.C. Code § 22-4134 (b).

Court of Appeals, for example, has held that "because the evidence has been in the custody of the State, the State has the burden of establishing that it no longer exists." *Blake v. State*, 909 A.2d 1020, 1028 (Md. 2006) (collecting cases); *see also People v. Pitts*, 828 N.E.2d 67, 72 (N.Y. 2005) ("[I]t is the People, as the gatekeeper of the evidence, who must show what evidence exists and whether the evidence is available for testing.").

The government argues that "[p]lacing the burden on the applicant to establish that specific, testable material was acquired by the government as evidence in the case" would comport with the applicant's burdens to "[i]dentify the specific evidence for which DNA testing is requested" under § 22-4133 (b) and to prove materiality under § 22-4133 (d). We disagree. It is one thing to name testable evidence and to explain why it matters and another thing entirely to prove it exists. The government further argues that placing the burden on applicants would not render relief under the IPA almost impossible because applicants "are aware of the evidence that was introduced at their trials" or was disclosed through discovery. *See* Super. Ct. Crim. R. 16. But again, being aware of the evidence at one's trial, or of the evidence disclosed through discovery, does not enable an applicant to rebut the government's claim that the evidence never existed or no

longer exists. Finally, the government argues that placing the burden on the government would disturb the finality of the criminal conviction. With regard to DNA testing spurred by claims of actual innocence, however, disturbing finality may be the very point. *See Bouknight*, 867 A.2d at 251 (explaining D.C. Council's aims in passing the IPA).

Our supplemental briefing order also asked the parties to address "generally what kind of showing . . . would be sufficient to meet this burden." We note at the outset that the procedure must comport with the applicant's "liberty interest" under the IPA. "The IPA has created a liberty interest in providing for post-conviction relief, and the District's procedures for vindicating that interest must satisfy due process." *Hood v. United States*, 28 A.3d 553, 562 (D.C. 2011); *see also Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009) ("Osborne does, however, have a liberty interest in demonstrating his innocence with new evidence under state law."). We recognize that a "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981). Our procedures for implementing the IPA thus must be worthy of the "parent right." Given the liberty interest at stake, a court cannot ratify the

government's representation that the biological evidence does not exist without providing the applicant with an opportunity to weigh in on the procedure the government employed in reaching that conclusion. *See Arey v. State*, 29 A.3d 986, 991 (Md. 2011) (*Arey II*) ("Arey still must be given the opportunity to probe, challenge, or otherwise respond to the statements in the affidavit before a decision can be rendered."); *Arey v. State*, 929 A.2d 501, 510 (Md. 2007) (*Arey I*) ("[I]f the court determines that there is a *genuine* factual dispute as to whether the evidence exists, ordinarily the court should hold a hearing."); *Blake*, 909 A.2d at 1030 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

In *Blake*, the Maryland Court of Appeals rejected the government's proffer—a police memorandum responding to a prosecutor's request, stating that "[t]he Evidence Control Section was checked by the undersigned, and there was no Evidence found for that case," 909 A.2d at 1022—because "[t]here are many other likely places," other than an evidence locker, "where the evidence may have been stored," *id.* at 1031.[6] The government says *Blake* is different because the applicant

---

[6] *See Postconviction DNA Testing: Recommendations for Handling Requests*, National Institute of Justice, National Commission on the Future of DNA Evidence (Sept. 1999), https://www.ncjrs.gov/pdffiles1/nij/177626.pdf. This national report urged prosecutors to avoid hastily dismissing prisoners' requests for

(continued…)

there sought "DNA testing of scientific evidence used by the State at his trial," *id.* at 1021, while Mr. Mitchell seeks DNA testing of material *not* used at his trial. It argues that the record here "does not indicate that any DNA evidence was collected from the crime scene."

Several factors suggest that the material's absence from the record, while probative, may not be dispositive of its nonexistence. The record, especially in the pre-DNA era, might not reflect when a garment or a weapon or other tangible evidence contains biological material. Police might have obtained material not ultimately included in the record, and, in such cases, that very absence from the record might have contributed to a wrongful conviction. Limiting the search to evidence in the record might also lead the government to check the record instead of its inventory.

---

(…continued)
DNA testing and recommended checking police evidence rooms, prosecutors' offices (for evidence introduced at trial), crime laboratories, hospitals or clinics (for sexual assault kits), defense counsel offices, court evidence rooms, and the offices of court clerks and court reporters. *Id.* at 46. "Finding the evidence is the most difficult part of the process. . . . Many times all parties believe that the evidence has been destroyed, when in fact it has not." *Id.* at 45.

Finally, the IPA's strictures dispel any concern that prisoners could compel police officials to needlessly search their inventories. An applicant for post-conviction DNA testing must still meet the § 22-4133 (b) requirements and show, under § 22-4133 (d), "a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent of the crime." By the IPA's terms, Mr. Mitchell bears these burdens. But he does not carry the obligation to investigate whether the material exists. The government assumed that obligation to the extent it urged us to bypass consideration of § 22-4133 (b) and (d) and deny Mr. Mitchell's application for DNA testing because "there simply is no DNA evidence from the crime scene to test."

In sum, if the government asks the court to deny an application for post-conviction DNA testing—not by contesting whether the testing would yield exculpatory evidence but by asserting that the sought-after evidence does not exist—then consistent with the liberty interests at stake, we require a reasonable search for the evidence, meaning an extensive search in any place the evidence could reasonably be found. *See Washington v. State*, 37 A.3d 932, 945 (Md. 2012) (stating that "the State must check every location where the evidence could

reasonably be located"); *Blake*, 909 A.2d at 1031 (requiring "an extensive search for the evidence"). In this case, we do not know where the government checked, what it checked for, or whom it checked with—if it checked at all. In fact, the government appears to have relied exclusively on trial records. We do not know, merely by reviewing those records, whether the sought-after material once existed, and if it existed, whether it was retained.[7] Absent such an accounting, we cannot say that Mr. Mitchell's application "fails at its inception."

On remand, if the government contends that the material does not exist or no longer exists, it must proffer evidence of a reasonable search—evidence that the defense might probe at a hearing—and the trial court should determine whether the government has reasonably searched for Mr. Mitchell's sought-after "blood evidence." The trial court's inquiry is not whether the material does not exist or no longer exists, but whether the government has performed a "reasonable search." If

---

[7] In a series of recent decisions, the Maryland Court of Appeals has refined its parallel doctrine on post-conviction searches for biological evidence. *See, e.g.*, *Washington v. State*, 37 A.3d at 943-46(summarizing several prior decisions); *Horton v. State*, 985 A.2d 540, 549 (Md. 2009) (deeming the government's showing insufficient where it only showed "that [the] evidence was authorized for destruction," not "that any evidence was actually destroyed"); *Arey I*, 929 A.2d at 508 (requiring the government to "identify the protocol [for the destruction of evidence] that was in place from the time of the trial to the time of the request for testing, if possible, and see if that protocol was followed").

the government cannot demonstrate that it has performed a reasonable search, the court can order it to take additional measures. The locations and overall reasonableness of the search depend on the particular facts of the case.[8]

## B. The Requirements of § 22-4133 (b)

We next consider whether Mr. Mitchell's request for DNA testing met the requirements of § 22-4133 (b). The trial court concluded that Mr. Mitchell "has not submitted the proper affidavit stating that he is actually innocent of this crime,

---

[8] For reasonable searches, see, *e.g.*, *People v. Garcia*, 886 N.Y.S.2d 110, 111 (N.Y. App. Div. 2009) ("The People presented detailed affidavits by the detectives and the prosecutor, based on personal knowledge, setting forth their diligent but unsuccessful efforts to locate certain items recovered in 1995 from the scene of a homicide. This satisfied the People's burden to show that the evidence on which forensic DNA testing was to be performed could no longer be located and was thus no longer available for testing."); *People v. Velez*, 859 N.Y.S.2d 568 (N.Y. App. Div. 2008) ("[T]he People met their burden of establishing that no such evidence is available for testing by submitting an official record indicating that the evidence was destroyed in 1994."). For unreasonable searches, see, *e.g.*, *Horton*, 985 A.2d at 547 (concluding that the government had not met its burden where "the [hospital's] microbiology department, which might have screened the victim's samples for sexually-transmitted diseases, had not been searched"); *People v. West*, 837 N.Y.S.2d 415, 416-17 (N.Y. App. Div. 2007) (determining that the government had not met its burden when relying "solely upon a State Trooper's affirmation that the evidence had been destroyed" because "it does not claim to be based upon personal knowledge of the evidence's destruction, does not state the source of the Trooper's knowledge or reveal when or where the evidence was destroyed," and is "lacking . . . any reference to police records of the evidence's storage or disposal").

nor has he identified the specific evidence he seeks to have tested."[9] The court noted that these "administrative requirements could be remedied through a properly filed application," and we presume that the court would have afforded Mr. Mitchell an opportunity to remedy any deficiencies in his application if it believed Mr. Mitchell could meet the fourth pleading requirement to explain how the DNA results would help show innocence. But the court did not believe Mr. Mitchell could meet that fourth requirement. In its view, Mr. Mitchell "fail[ed], in his detailed explanation of the need for DNA testing, to adequately explain how such testing would help establish his actual innocence," and it again rejected Mr. Mitchell's request for DNA testing after later receiving his affidavit.

In our view, Mr. Mitchell's initial motion[10]—together with the affidavit filed with his later reply—met the four requirements of § 22-4133 (b). "To the extent that the statute affords the trial court discretion in its application of the IPA, we review for abuse of discretion." *Veney v. United States*, 936 A.2d 811, 822 (D.C. 2007). Whether the court applied the correct legal standard is a question of law

---

[9] At the time of this order, the court had not received Mr. Mitchell's reply to the government's opposition, which included his affidavit claiming innocence.

[10] Though we refer to one "initial" motion, there were actually two initial motions, both of which were received, according to the court's date stamp, before the court ordered the government to respond.

that we consider de novo. *See Davis v. United States*, 564 A.2d 31, 35 (D.C. 1989) (en banc).

Section 22-4133 (b)(1) required Mr. Mitchell to state, under penalty of perjury, that he is actually innocent of the crime. Mr. Mitchell submitted an affidavit in his response to the government opposition. But even before doing so, he claimed to be "100% positive that such a test will exonerate" him. Section 22-4133 (b)(2) required Mr. Mitchell to identify the specific evidence for which he was requesting DNA testing. Contrary to the motion court's finding, Mr. Mitchell met this requirement in his initial motion by identifying "scatterings of blood leading from a rear bedroom, where the homicide occurred, to the front door of the apartment." In his later response, he requested testing of "all blood samples collected at the crime scene, which was a small two bedroom apartment." Given the finite crime scene in this case, "specific evidence" cannot be so specific as to require Mr. Mitchell to compile a literal laundry list of material—bloody sock, bloody carpet, bloody footprint. Such a strict requirement would obstruct the IPA's goal of exonerating wrongfully convicted prisoners. Mr. Mitchell's application requesting testing of bloody material from the apartment met the requirements of § 22-4133 (b)(2).

Section 22-4133 (b)(3) required him to set forth the reason DNA testing had not previously been completed. He met this requirement by stating that "DNA testing was not available at the time of the original trial" in 1991.

Section 22-4133 (b)(4) required Mr. Mitchell to explain how DNA testing would help establish his innocence. He met this requirement by explaining that "the assailant became involved in a scuffle with the decedent," that "the depth of the battle" yielded a "high probability that the assailant himself was injured in the brawl," and that given the government's single-shooter theory, and other evidence suggesting that a single person had committed the crime, "a DNA test will point a clear finger at the true perpetrator." The court acknowledged that Mr. Mitchell had offered a "detailed explanation of the need for DNA testing." But it erred in asking whether he had "adequately explain[ed]" how DNA testing would help establish his innocence. Section 22-4133 (b)(4) requires an applicant to "[e]xplain how the DNA evidence would help establish that the applicant is actually innocent"—not to explain adequately or sufficiently, just to explain.

Except for the missing affidavit, Mr. Mitchell met the § 4133 (b) requirements entirely in his initial motion. The IPA identifies the evidentiary standard ("reasonable probability") in a later section, § 22-4133 (d), suggesting

that § 22-4133 (b) is not the place to assess the plausibility of the explanation, but rather is a checklist of threshold requirements. Because § 22-4133 (b)(4) requires only a basic explanation, the trial court should have checked off § 22-4133 (a), which the government did not contest, checked off the requirements of § 22-4133 (b), and proceeded to evaluate Mr. Mitchell's application under § 22-4133 (d).

**C. The Evidentiary Standard of § 22-4133 (d)**

We next address whether the trial court assessed Mr. Mitchell's application for DNA testing under the evidentiary standard set forth in § 22-4133 (d)—namely, whether "there is a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent." We consider de novo whether the court used the correct "reasonable probability" standard of § 22-4133 (d). *See Davis*, 564 A.2d at 35.

In denying Mr. Mitchell's application for DNA testing, the court stated that "the IPA requires specific, non-conclusory facts that demonstrate that the movant is actually innocent despite having been convicted at trial," citing § 22-4135 (c)(2). It found "no explanation as to how the absence of Defendant's DNA at the scene or the presence of another party's DNA could provide specific evidence of actual

innocence." Yet the IPA does not require an applicant *for DNA testing* to show "specific" evidence of innocence. The court appears to have mistakenly borrowed the pleading requirement of "specific, non-conclusory facts" from § 22-4135 (c), which governs motions "to vacate the conviction or to grant a new trial on grounds of actual innocence based on new evidence," § 22-4135 (a), and assessed Mr. Mitchell's request against that requirement, as opposed to using the "reasonable probability" standard of § 22-4133 (d).[11]

Rather than deciding ourselves whether Mr. Mitchell showed a "reasonable probability," we remand his application for DNA testing to the trial court to give it an opportunity to parse alternative versions of the factual record and to apply the

---

[11] The IPA requires a movant seeking to vacate a conviction to plead with greater specificity than a movant seeking DNA testing. Before a court can "vacate the conviction or . . . grant a new trial on grounds of actual innocence based on new evidence," § 22-4135 (a), the movant's "motion shall set forth specific, non-conclusory facts: (1) Identifying the specific new evidence; (2) Establishing how that evidence demonstrates that the movant is actually innocent despite having been convicted at trial or having pled guilty; and (3) Establishing why the new evidence is not cumulative or impeaching." § 22-4135 (c). The court must grant a new trial if it concludes "that it is more likely than not that the movant is actually innocent." § 22-4135 (g)(2). The court must vacate the conviction and dismiss the relevant count with prejudice if it concludes "by clear and convincing evidence that the movant is actually innocent." § 22-4135 (g)(3). A court's inquiry into an application for DNA testing thus differs from its inquiry into these other motions. The trial court applied the "specific, non-conclusory facts" requirement correctly with reference to Mr. Mitchell's other claims, discussed *infra*.

reasonable probability standard in the first instance.[12]  *See Johnson v. Payless Shoe Source, Inc.*, 841 A.2d 1249, 1257 (D.C. 2004) ("A litigant is 'entitled to have the trial judge exercise . . . discretion unfettered by erroneous legal thinking.'  Where this has not occurred, we ordinarily remand for reconsideration of the ruling under the proper standard." (quoting *Wright v. United States*, 508 A.2d 915, 919 (D.C. 1986))).

**D. Mr. Mitchell's Other Claims**

The trial court's other rulings concern Mr. Mitchell's alleged new evidence of actual innocence, alleged prosecutorial misconduct, § 23-110's constitutionality, the court's jurisdiction vis-à-vis the Bureau of Prisons, and the denial of a

---

[12]  According to Mr. Mitchell, the record shows that the assailant became bloodied from fighting the decedent.  DNA testing on "blood evidence," if it matched someone other than the decedent, could therefore identify the assailant. *Cf. Cuffey v. United States*, 976 A.2d 897, 899 (D.C. 2009) (finding that the applicant could not demonstrate a reasonable probability that "DNA testing of [the victim's] shirt would help establish appellant's actual innocence of the murder" because the presence of another person's blood on the shirt in addition to the applicant's own blood would not have helped establish the applicant's innocence). The government disputes whether the assailant would have emerged bloodied. And if the assailant left without spilling blood, DNA testing on blood evidence would reveal nothing.  The relevant sections of the transcript have not been lodged in this appeal.

hearing.[13] We address these claims in turn, and in each respect, we uphold the trial court's ruling.

### 1. New Evidence

Mr. Mitchell seeks to qualify several items as newly discovered evidence under the IPA. The IPA defines "new evidence" as that which "[w]as not personally known and could not, in the exercise of reasonable diligence, have been personally known to the movant at the time of the trial or the plea proceeding"; "[w]as personally known to the movant at the time of the trial or the plea proceeding, but could not be produced at that time" for several enumerated reasons; or "[w]as obtained as a result of post-conviction DNA testing." § 22-4131 (7). New evidence must demonstrate "actual innocence," § 22-4135 (a), which is defined as a showing "that the person did not commit the crime of which he or she was convicted." § 22-4131 (1). *See also Bousley v. United States*, 523 U.S. 614, 623 (1998) ("'Actual innocence' means factual innocence, not mere legal insufficiency.").

---

[13] On appeal, Mr. Mitchell has not pursued his earlier claim that his sentence violated *Blakely v. Washington*, 542 U.S. 296 (2004).

Mr. Mitchell reports having been diagnosed with paranoid schizophrenia and anti-social personality disorder while in prison and presents these psychiatric diagnoses as "new evidence" under the IPA. He argues that his mental illness, which he claims to have suffered from at the time of his trial, rendered him "not responsible for any of his actions during the time of the alleged crime" and "not competent to stand trial." The IPA does not offer him relief, however, because, as the trial court concluded, "this information in no way establishes [his] actual innocence" and because, as he could describe symptoms "going back to his teens," his illness is not "new" within the meaning of the IPA.

Mr. Mitchell pursues this claim not just under the IPA but also under § 23-110, arguing that the trial court violated his due process rights to a fair trial when it did not question his competence or order a competency examination sua sponte. To test a defendant's competency to stand trial, we ask "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).[14]

---

[14] In addition, as mandated by due process, *see Gorbey v. United States*, 54 A.3d 668, 678 (D.C. 2012), D.C. Code § 24-531.01 (1) defines "competence" to

(continued…)

The record from Mr. Mitchell's trial undermines his claim by showing that he participated intelligently and vigorously in his defense. *See Hargraves v. United States*, 62 A.3d 107, 115 (D.C. 2013) (finding trial court did not err in finding defendant competent to stand trial); *Bradley v. United States*, 881 A.2d 640, 647 (D.C. 2005) (finding trial court did not err in not ordering competency hearing sua sponte).

Mr. Mitchell also presents as new evidence an affidavit from Denise Mitchell, dated June 8, 2005. The affidavit states that "some portions of my testimony and statement were not true," and that she was forced to engage in sexual relations with two male detectives who gave her "financial assistance" and coached her on her testimony. Mr. Mitchell argues that while the affidavit does not assert his innocence, "the reasonable inference is *clearly* implied." No doubt that these allegations, if true, constitute appalling conduct by the police. Even so, the allegations do not implicate Mr. Mitchell's innocence, much less meet the evidentiary burden in § 22-4135 (g)(2) or § 22-4135 (g)(3). The court did not

---

(…continued)

mean "that a defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and has a rational, as well as a factual, understanding of the proceedings against him or her."

abuse its discretion in finding that Ms. Mitchell's affidavit does not establish Mr. Mitchell's innocence.

Nor do Ms. Mitchell's allegations warrant relief under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Ms. Mitchell did not witness the crime. Her trial testimony described the "repeated emotional and physical abuse by [Mr. Mitchell] throughout their marriage," which went to Mr. Mitchell's motive for attacking the men he thought were living with her. *Mitchell*, 629 A.2d at 13. Her vague recantation—that "some portions of my testimony and statement were not true"— does not cast doubt upon the statement she gave to a female police interviewer, against whom she alleges no misconduct, in the hours immediately after the murder, where she also described Mr. Mitchell's extensive violence toward her. Given the limited scope of Ms. Mitchell's trial testimony and the government's untainted evidence corroborating its substance, we cannot say that these allegations, even if true, demonstrate a "reasonable probability" that the jury would have reached a different outcome had the government disclosed the alleged misconduct and enabled the defense to impeach Ms. Mitchell's testimony. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Meade v. United States*, 48 A.3d 761, 767 (D.C. 2012) (The complainant's "failure to repudiate or deny her

contemporaneous account of what happened makes it unlikely that her alleged recantation would lead to a different result."); *Ginyard v. United States*, 816 A.2d 21, 32 (D.C. 2003) ("The burden is on the defendant to establish such a reasonable probability.").

Also as new evidence, Mr. Mitchell presents an affidavit from his codefendant Rebecca Halicki, dated October 2, 1995, recanting certain statements she made to the police after her arrest. Ms. Halicki did not testify at Mr. Mitchell's trial and the parties dispute whether she testified at the grand jury. Mr. Mitchell did not raise this claim in his first § 23-110 motion, filed in 1996, despite taking the stand at the 1997 evidentiary hearing granted on that motion and despite knowing that Ms. Halicki had recanted. In an effort to show cause for this failure, he claims that he did not physically possess the affidavit—a state of affairs he attributes to Ms. Halicki's "multiple housing moves and arrests," which made "locating and communicating with her impossible at times." But where Mr. Mitchell was aware of the content of the affidavit and yet failed to raise it in his testimony at his evidentiary hearing nearly two years later, the court did not abuse its discretion in declining to find "cause" and deeming the claim procedurally

barred.[15] *See Bradley*, 881 A.2d at 646 ("To establish sufficient cause for failing to assert his current claims in his previous motion, appellant must show that he 'was prevented by exceptional circumstances' from doing so."); *Washington v. United States*, 834 A.2d 899, 902 (D.C. 2003) ("[W]hen, as in this case, the defendant has already launched several collateral attacks on his conviction, the reasons supporting the application of the cause and prejudice test are even more compelling." (internal quotation marks and citations omitted)).

Finally, Mr. Mitchell presents as new evidence his February 1990 phone bill, showing calls in Ohio on the night before and morning after the murder. Mr. Mitchell claims that "this evidence could not have been obtained sooner through due diligence" due to his arrest and the home's vacancy. The court did not abuse its discretion in rejecting his claim that no one could have gained access to the

---

[15] The trial court also expressed doubt that Ms. Halicki's recantation—which contradicted her testimony at her own trial incriminating Mr. Mitchell, *Halicki v. United States*, 614 A.2d 499, 500-01 n.8 (D.C. 1992)—"would probably produce an acquittal in a new trial." *See Meade v. United States*, 48 A.3d at 766 (denying an IPA claim in part because the complainant's recantation "would, at best, have been used to impeach her initial account of the events"); *United States v. Kearney*, 682 F.2d 214, 219 (D.C. Cir. 1982) ("Recanting affidavits and witnesses are looked upon with 'the utmost suspicion' by the courts."). Under the IPA, a court must conclude "that it is more likely than not that the movant is actually innocent" before granting a new trial. § 22-4135 (g)(2).

records and in concluding that Mr. Mitchell did not meet the due diligence standard for newly discovered evidence, especially considering that Mr. Mitchell's parents owned and could enter the house. *See Bouknight*, 867 A.2d at 255 (discussing the due diligence standard). The court also did not abuse its discretion in finding that the records do not establish innocence because they "do not identify the person who made or received the phone calls." In addition, as the government notes, Mr. Mitchell could have driven from Ohio to D.C. and back to Ohio between phone calls.

### 2. Prosecutorial Misconduct

Mr. Mitchell alleges that the government committed misconduct by knowingly offering false testimony from Rebecca Halicki and Denise Mitchell and by obtaining Ms. Halicki's testimony under threat of prosecution. The court did not abuse its discretion in ruling that Mr. Mitchell had "failed to provide any actual evidence whatsoever of government misconduct in his case."

Ms. Halicki, who was not a witness at Mr. Mitchell's trial but may have testified at the grand jury, does not allege prosecutorial misconduct in her affidavit, and Mr. Mitchell has not substantiated this claim as to her. Ms. Mitchell, by contrast, at least states that she told the prosecutor that "some portions of my

testimony and statement were not true" and that the prosecutor "told me it would still be alright." The affidavit does not indicate what parts of her testimony were false. Nor does it challenge the descriptions of domestic violence that she gave on the morning of the murder to a police officer whom she does not accuse of misconduct—statements that were consistent with her trial testimony. In addition, Mr. Mitchell has not shown cause for not bringing these claims in his previous collateral attack. *See Washington*, 834 A.2d at 902; *Head v. United States*, 489 A.2d 450, 451 (D.C. 1985).

Mr. Mitchell also claims that the government withheld police notes that supposedly identified two eyewitnesses, thereby violating its obligations under *Brady v. Maryland*. But in ruling on Mr. Mitchell's first § 23-110 motion, the trial court, after a hearing, found that Mr. Mitchell's trial counsel had received the notes among the discovery materials and, having taken other steps to locate eyewitnesses, was not ineffective for failing to pursue those leads. In considering this most recent § 23-110 motion, the court therefore did not abuse its discretion in denying Mr. Mitchell's claim that the government withheld certain police notes.

Nor did the court abuse its discretion in rejecting Mr. Mitchell's argument that the government's ballistics evidence was "flawed and based upon 'junk

science'" and that "the government knew of these short-comings in their evidence gathering . . . and did nothing to correct" them.[16] He neither substantiates these allegations nor explains how the ballistics evidence, even if flawed, contributed to his conviction.

### 3. Constitutional Challenge to § 23-110

Mr. Mitchell's equal protection challenge to § 23-110—a statute that indeed treats D.C. prisoners differently from other "state" prisoners—is foreclosed by *Swain v. Pressley*, 430 U.S. 372 (1977). *See also Garris v. Lindsay*, 794 F.2d 722, 726 (D.C. Cir. 1986). In *Swain*, the Supreme Court considered whether § 23-110 "denied persons convicted in [D.C. courts] equal protection of the laws" given that these persons "must assert any collateral attack on their convictions before Art. I judges, whereas persons convicted under general federal law are allowed to attack their convictions before Art. III judges." 430 U.S. at 379 n.12. The Court held that § 23-110 did not violate equal protection because "[a] rational basis for the classification is found in the purpose behind the Court Reform Act." *Id.* This

---

[16] The government considered this claim "abandoned" because Mr. Mitchell did not address it in his opening brief, which he prepared pro se. His court-appointed counsel argued the issue in his reply brief. Considering Mr. Mitchell's pro se status, we choose to address it.

rational basis also undercuts Mr. Mitchell's unsubstantiated allegation that § 23-110 was "intended to cause racial discrimination."

### 4. Presentence Investigation Report

Mr. Mitchell argues that the D.C. Superior Court has jurisdiction to correct the Federal Bureau of Prisons' reliance on a flawed presentence report and separation order. Reviewing this jurisdictional claim de novo, *United States v. Crockett*, 861 A.2d 604, 607-08 (D.C. 2004), we conclude that the court properly construed this claim as a petition for writ of habeas corpus because it concerns "the executive department's execution of sentence, not the trial court's imposition of sentence." *Alston v. United States*, 590 A.2d 511, 514 (D.C. 1991). As we have explained, it therefore "may not be raised under § 23-110," *id.*, and must be raised in federal court against the custodian. *Crockett*, 861 A.2d at 607 (no jurisdiction to direct the BOP on implementing prisoner's sentence).[17]

---

[17] The trial court still sought to provide Mr. Mitchell's penitentiary with a copy of the amended presentence report and the trial court's earlier order rescinding the troublesome separation order. We note that Mr. Mitchell would not be asking the federal court to alter records prepared in another jurisdiction, but rather to lodge with his custodian already-corrected records.

### 5. Hearing

For claims under the IPA, "the question whether a hearing is required is confided to the sound discretion of the trial court." *Meade*, 48 A.3d at 765 (citation omitted). Consistent with our discussion of the trial court's rulings, though the court may hold a hearing concerning DNA testing on remand, we conclude that the court did not abuse its discretion in determining that Mr. Mitchell's claims fit into the "three categories of claims that do not merit hearings: (1) vague and conclusory allegations, (2) palpably incredible claims, and (3) assertions that would not merit relief even if true." *Ramsey v. United States*, 569 A.2d 142, 147 (D.C. 1990). *See also* D.C. Code § 22-4135 (e)(l) (requiring no hearing under the IPA where "the motion and files and records of the case conclusively show that the movant is entitled to no relief"); *Bell v. United States*, 871 A.2d 1199, 1201 (D.C. 2005) ("The standard for when a hearing must be held under the IPA mirrors exactly the standard for a hearing required by D.C. Code § 23-110 . . . ." (internal citation omitted)).

### III. Conclusion

For the reasons stated above, we affirm in part, reverse in part, and remand for further proceedings.

*So ordered.*